### Commonwealth of Massachusetts

MIDDLESEX,SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 2081CV00208

Amimi, Mohamed , PLAINTIFF(S),

v.

Whole Foods Market , DEFENDANT(S)



#### SUMMONS

THIS SUMMONS IS DIRECTED TO Whole Foods Market . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the
Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been
filed in the Middlesex Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1.  **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide
    the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the
    opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect
    to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an
    extension of time in writing from the Court.**

2.  **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a
    copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
    a. Filing your **signed original** response with the Clerk's Office for Civil Business, Middlesex Superior Court,
    200 Trade Center, 2nd Floor, Woburn MA 01801 (address), by mail or in person, **AND**
    b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following
    address: Jacob Thaler, Slnlaw, LLC 46 S. Main St., Sharon, MA 02067

3.  **What to include in your response.** An "Answer" is one type of response to a Complaint. Your Answer
    must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint.
    Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to
    use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims)** that are
    based on the same facts or transaction described in the Complaint, then you must include those claims
    in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this
    lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your
    Answer or in a written demand for a jury trial that you must send to the other side and file with the
    court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a
    **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion
    to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If
    you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions"
    described in the rules of the Court in which the complaint was filed, available at
    www.mass.gov.courts/case-legal-res/rules of court.

A true copy Attest:

Joseph P Casey
Deputy Sheriff Suffolk County

2-7-20

4.  **Legal Assistance.** You may wish to get legal help from a lawyer.  If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.  **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on *January 26*, 20*20*.

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on_____, 20___ , I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____, 20____         Signature: _____

**N.B.**     **TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

_____
|                               |
|                    , 20___    |
|_____|

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                          SUPERIOR COURT DEPARTMENT
                                       CIVIL ACTION NO.:

---

**MOHAMED AMIMI,**                )
    Plaintiff           )
                                  )
v.                                )
                                  )
**WHOLE FOODS MARKETS,**          )
    Defendant            )
                                  )

---

## COMPLAINT

Plaintiff, Mohamed Amimi, by and through his counsel, alleges as follows:

## PARTIES

1. Plaintiff, Mohamed Amimi ("Plaintiff" or "Mr. Amimi"), is an adult resident of Stoneham, Massachusetts.

2. Defendant, Whole Foods Markets ("Defendant" or "WFM"), is a Texas Corporation, with a principal office located at 550 Bowie St., Austin, Texas 78703.

3. WFM was an employer of Mr. Amimi's for purposes of the Massachusetts Fair Employment Practices Act (M.G.L. c. 151B) and Title VII of the Civil Rights Act of 1964 ("Title VII").

4. From April 2008 to October 2018, WFM employed Plaintiff as a Team Member and Team Leader at a variety of its stores located in both Massachusetts and North Carolina.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to G.L. c. 212, § 3.

6. This Court has personal jurisdiction over WFM because it employed Plaintiff to work as its agent in the Commonwealth; and because the acts and omissions giving rise to this Complaint occurred in the Commonwealth.

7. Venue is proper in this Court pursuant to G.L. c. 223, § 2, because Plaintiff resides in this judicial district.

## FACTUAL ALLEGATIONS

8. Whole Foods Market ("WFM") is a global food retailer with stores across the United States, including Massachusetts.

9. In April 2008, Mr. Amimi was initially hired as a full-time Produce Service Team Member at WFM earning an hourly wage of $10.00.

10. Over the next ten years, Mr. Amimi worked at a variety of WFM locations, earning multiple promotions for his work performance, both in Massachusetts and North Carolina.

11. In May 21, 2018, Mr. Amimi's exceptional job performance was recognized by WFM when he was recommended by his supervisor to be promoted to Produce Team Leader at WFM's "Symphony store", located at 15 Westland Ave., Boston, MA.

12. Upon information and belief, Mr. Amimi was the only Muslim and North African-American Team Leader at the Symphony store.

13. WFM and Ms. McMurtrie was fully aware of Mr. Amimi's religion as Mr. Amimi had disclosed his need to attend Mosque to Ms. McMurtrie on multiple occasions and his consistent scheduling of his work schedule around Friday Mosque services.

2

14. Mr. Amimi has dark brown-pigmented skin, typical of individuals from the
    Middle East or of Northern-African descent.

15. At the time of his promotion to Team Leader of the produce department, arguably
    the largest department in the store, Mr. Amimi was given a $1.00 raise in
    connection with that promotion.

16. Additionally, Mr. Amimi was given his standard annual pay raise of $1.50, a pay
    raise he would have received notwithstanding his promotion to Team Leader of
    the Produce Department.

17. In or around the time that Mr. Amimi was promoted to Team Leader, two other
    WFM employees, Becky Lebrun ("Ms. Lebrun") and Leo Westebbe ("Mr.
    Westebbe") were also promoted to Team Leader positions. Both Team Leaders
    are non-African, non-Muslim, Caucasian individuals.

18. Despite being promoted to smaller departments and possessing the same or less
    experience than Mr. Amimi, both Ms. Lebrun and Mr. Westebbe were curiously
    given larger raises than what was provided to Mr. Amimi by Ms. McMurtrie.

19. To add insult to injury, Mr. Amimi's pay raise upon being promoted to Team
    Leader was already less than what Ms. Lebrun had been previously earning as an
    Assistant Team Leader. Notwithstanding this fact, Ms. Lebrun was still given a
    higher pay raise at the time of her promotion to Team Leader of a smaller
    department than that of Mr. Amimi.

20. When Mr. Amimi learned of the disparity between him and the other recently
    promoted team leaders, he raised his concerns with Ms. McMurtrie who

3

ultimately refused to provide him with a raise that was at least equal that of Ms. Lebrun.

21. Additionally, when Amazon (WFM's Parent Company) announced a wage increase of $2.00 (effective November 2018) for all Team Leaders, Ms. McMurtrie told Mr. Amimi that his pay raise of $1.50 connected with his annual job dialogue would remain as is and would not increase in connection with Amazon's announcement.

22. In addition to Ms. McMurtrie's refusal to provide Mr. Amimi with a pay raise that was equal to those employees who were not a part of Mr. Amimi's protected class, Ms. McMurtrie similarly failed to provide Mr. Amimi with the same level of job support as Ms. Lebrun.

23. Shortly after being promoted to Team Leader of Produce, Mr. Amimi's ATL left his position, thus leaving Mr. Amimi without an ATL in WFM's busiest department.

24. While, Ms. McMurtrie did open the position up, she took almost no action to secure an ATL to assist Mr. Amimi with such a difficult and busy department.

25. Upon the departure of Mr. Amimi's ATL, Mr. Amimi requested that Ms. McMurtrie hire Steven Rice, who Mr. Amimi had worked with at another WFM location, but Ms. McMurtrie did not take the suggested action.

26. In fact, the ATL position in produce remained unfilled for the remainder of Mr. Amimi's employment at WFM.

27. By contrast, when Ms. Lebrun was promoted to team leader and was also without an ATL in her comparatively smaller department, Ms. McMurtrie quickly filled

4

the position in a matter of weeks. Tellingly, Ms. McMurtrie did hire Mr. Steven
Rice into the position of ATL in the Produce Department after Mr. Amimi had
left WFM and a new Produce Team Leader had been appointed.

28. Throughout the entirety of Mr. Amimi's employment at WFM, Mr. Amimi was
allowed to schedule his own working hours. As a practicing Muslim man, Mr.
Amimi would regularly schedule his hours so that he did not work at all on
Fridays, finished his workday by 12:00pm, or did not start work until after
3:00pm so that he could attend Mosque services.

29. On August 31, 2018, Ms. McMurtrie informed all team leaders that the Regional
President would be visiting the Store and would need all Team Leaders present in
the Store on that Friday. Ms. McMurtrie was clearly aware at this time of Mr.
Amimi's religion as he consistently scheduled his working hours around Mosque
on Fridays.

30. After receiving the email from Ms. McMurtrie, Mr. Amimi informed her that he
could not be there at the time requested because it would interfere with his ability
to attend Mosque on Friday. In response, Ms. McMurtrie made no attempt to
accommodate or discuss an alternative solution for Mr. Amimi. Rather, she said
that there was "nothing that she could do" and "he had to be there." As a result,
Mr. Amimi was forced to miss Mosque services on that day.

31. In addition to Ms. McMurtrie's inappropriate response to Mr. Amimi's request for
a religious accommodation, Ms. McMurtrie similarly showed her discriminatory
animus towards Mr. Amimi's religion and national origin during a conversation
between the two of them in September of 2018.

5

32. On or about September 6, 2018, during a casual conversation between Mr. Amimi and Ms. McMurtrie, Mr. Amimi stated that another WFM co-worker, Elijandro (last name unknown) had just passed his citizenship test and suggested to Ms. McMurtrie that WFM plan a celebration for him.

33. Instead of sharing in Mr. Amimi's excitement for his co-worker, Ms. McMurtrie curiously asked Mr. Amimi if he (Mr. Amimi) was a U.S. citizen. When Mr. Amimi responded that he was a citizen, Ms. McMurtrie responded by saying, "lucky you, you saw what happened on 9/11," or something to that effect. Mr. Amimi was so shocked by Ms. McMurtrie's comment that he did not know how to respond.

34. Mr. Amimi took Ms. McMurtrie's comment to mean that she did not think he should be a citizen or that he was lucky to be a citizen because Muslims were responsible for the terrorist attacks that took place on 9/11/2001.

35. In August of 2018, Mr. Amimi started casually socializing with a female WFM employee named Chantal during their 30-minute breaks. After just a few conversations, Mr. Amimi and Chantal swapped phone numbers and began regularly texting one another.

36. After approximately one week of texting one another, Chantal began making sexual advances towards Mr. Amimi by jumping on Mr. Amimi and kissing him during their break periods. For several weeks, Mr. Amimi and Chantal engaged in a consensual romantic relationship.

6

37. During this time, Mr. Amimi and Chantal would often socialize with one another on their 15 and 30 minute break periods during the work day and on one occasion, the pair spent time together near Chantal's home in Jamaica Plain.

38. During the several week time period in which Mr. Amimi and Chantal were engaged in a romantic relationship, Mr. Amimi and Chantal frequently engaged in sexual acts, but never did they engage in intercourse.

39. At the beginning of September 2018, Chantal approached Mr. Amimi and Chantal asked if Mr. Amimi would hire her for the then open part-time floor employee in his Department.

40. However, as a result of their relationship at that time, Mr. Amimi explained to Chantal that the WFM rules prohibited him from hiring her to that position.

41. Chantal left the conversation visibly angered and refused to talk to Mr. Amimi.

42. Mr. Amimi and Chantal continued their romantic relationship for the next two and one-half weeks, until September 20, 2019.

43. During that time, Chantal would frequently tell Mr. Amimi when they met in person that she "wanted to have sex," only to later tell Mr. Amimi when they communicated via text message that she did not want to have sex. Each time Chantal communicated that she did not want to have sex via text message, Mr. Amimi replied that it was "Ok" and "no problem." This happened multiple times.

44. After several such occasions, Mr. Amimi finally asked Chantal why she appeared to be so hot and cold about their relationship and why she kept changing her mind about having sex with one another. Ultimately, Chantal told Mr. Amimi not to worry about it, and it was just a personal mental thing.

7

45. On September 20, 2018, Chantal told Mr. Amimi that she no longer wished to continue having a romantic relationship with him and Mr. Amimi replied by saying it was no problem, and they could just be good friends. From that date forward, Mr. Amimi did not text or engage in any additional sexual acts with Chantal as he considered the relationship to be over. However, both Chantal and Mr. Amimi still spoke to one another while at work.

46. On or about October 20, 2018, Chantal allegedly reported to Ms. McMurtrie that Mr. Amimi continued to pursue her romantically, despite her indicating to him that she was no longer interested in him.

47. Over the next several days, WFM purportedly investigated Chantal's claims by interviewing witnesses, reviewing text messages, reviewing video footage, and analyzing time cards.

48. On October 25, 2018, Ms. McMurtrie requested that Mr. Amimi come into her office to speak with Linda Shear ("Ms. Shear") and Danielle Tenczar ("Ms. Tenczar") (WFM Human Resources).

49. During the interview, Mr. Amimi was asked if he had a relationship or sexual relationship with anyone in the Symphony Store. Mr. Amimi truthfully answered that he was not, as he and Chantal had not been in a relationship for over a month by that point.

50. Upon further inquiry into the extent of their relationship, Mr. Amimi provided the interviewers with all of the details of his relationship with Chantal and how it ended.

8

51. Ms. Sheer and Ms. Tenczar went on to state that they had read text messages that asked him to stop and that he continued to pursue her. Mr. Amimi denied the allegation and was never shown the text messages in question. Neither investigator asked Mr. Amimi to see his text messages or gave him the time to collect them in order to rebut Chantal's accusations.

52. In addition to their accusations, without evidence, that Mr. Amimi had persisted in pursuing Chantal despite her rejection of his advances, Ms. Shear and Ms. Tenczar said that they had found two days in which he misrepresented his "time on the clock."

53. On one of the days in question, Mr. Amimi was accused of meeting up with Chantal while "on the clock," however despite Mr. Amimi explaining that he was on his 30 minute break at that time, it was apparently still used as grounds for his termination.

54. On the other purported time misrepresentation, Mr. Amimi met with Chantal while also going to his car to retrieve his phone charger, while taking his 15-minute break. Upon returning, Mr. Amimi realized that he had accidentally failed to punch out on his time clock.

55. As a result of the innocent mistake, Mr. Amimi proceeded to punch out to reflect a break period, but instead went back to work for an equal amount of time while off the clock, in order to make up for the accidental time mistake.

56. Despite Mr. Amimi's explanation of this seemingly inconsequential event and apparent video records that could have observed Mr. Amimi's behavior, Ms.

9

McMurtrie, Ms. Tanczar, and Ms. Shear apparently didn't give any credit to his explanation.

57. To that end, after merely one interview of roughly 10-15 minutes, Mr. Amimi was summarily terminated less than 24 hours later.

58. Mr. Amimi was not provided any time to identify witnesses or recover his text messages prior to his termination.

59. Mr. Amimi's explanation of events was given roughly an hour of consideration by comparison to the days of investigation and consideration given to Chantal.

60. Furthermore, as a result of speaking English as a second language, Mr. Amimi had a significantly harder time articulating himself and his defenses in the very short interview process than that of his White and native English speaking co-worker Chantal, who had multiple days to provide information to WFM human resources if need be.

61. WFM's failure to provide equal weight and consideration to both Chantal and Mr. Amimi was a violation of WFM's policy to conduct a thorough, objective, and good faith investigation" into allegations of misconduct.

62. Following his surprise and sudden termination, Mr. Amimi informed the investigator, Danielle Tenczar that he had been informed that Chantal had told a co-worker, Ms. Bianca Diaz, that she had fabricated the allegations that she made against Mr. Amimi.

63. Despite bringing this to Ms. Tenczar's attention, Mr. Amimi was never contacted again by WFM about this new information.

10

64. Upon information and belief, WFM never followed up on the Mr. Amimi's report that the allegations against him had been fabricated and WFM never addressed Chantal's actions.

65. Additionally, Mr. Amimi was treated significantly different than nearly every other similarly situated employee who was accused of engaging in inappropriate sexual conduct during Mr. Amimi's time at WFM.

66. In September of 2018, a non-African, Non-Muslim male, Mr. Jose Gonzalez ("Mr. Gonzalez"), was accused of kissing a woman from customer service without her consent. After the event, Ms. McMurtrie was seen crying and Mr. Gonzalez was sent home that day, but was never given a formal written warning and no investigation into the complaint against him was ever conducted.

67. Similarly, a non-African, white male named Harry, was accused of hugging a woman named Emily from behind without her consent.

68. The complaint against Harry resulted in a warning and no further investigation into the complaint was ever conducted.

69. In addition to Mr. Amimi, Ms. McMurtrie previously fired another Muslim man for a minor infraction, not usually resulting in termination.

## COUNT I
**Unlawful Discrimination On The Basis of Race and National Origin In Violation Of The Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, §§ 4(1), 4(1B)**

70. Plaintiff re-alleges and reasserts the allegations in all of the preceding paragraphs as if fully set forth herein.

71. Under Massachusetts law, it is unlawful for an employer, or any agent of the employer, to discriminate against an employee in the terms of that employee's

conditions of employment on the basis of that employee's race, religion, or national origin.

72. Plaintiff was an employee of WFM for the purposes of M.G.L. c. 151, §§4(1), 4(1B).

73. Plaintiff identifies as and is in fact a Muslim male individual from Morocco.

74. WFM was fully aware of Mr. Amimi's race, religion, and national origin.

75. WFM discriminated against Plaintiff on the basis of his race, religion, and national origin by, at the least, treating Plaintiff differently than similarly situated white, non-African, non-Muslim employees, as described herein.

76. WFM and its agents, Ms. McMurtrie and Ms. Tenzcar harbored discriminatory animus against Plaintiff on the basis of his race, religion, and national origin as evidenced by WFM's disparate treatment of Plaintiff in comparison to similarly situated white, non-African, non-Muslim employees, and further evidenced by Ms. McMurtrie's xenophobic comments made to Mr. Amimi, as described herein.

77. WFM's proffered reason for terminating Plaintiff was mere pretext for its discriminatory motives.

78. WFM's disparate treatment of Plaintiff in comparison to similarly situated white, non-African, non-Muslim employees was unlawful discrimination on the basis of race, religion, and national origin in violation of M.G.L. c. 151, §§4(1) 4(1B).

79. But for Plaintiff being a north African-Muslim male from Morocco, he would not have been the object of the adverse employment action (termination & sham investigation), as described herein.

12

80. WFM is vicariously liable for the discriminatory actions/omissions of its employees, officers, and agents.

81. Plaintiff has suffered actual pecuniary, emotional, and physical harm as a result of the actions/omissions of WFM.

82. Plaintiff is entitled to all appropriate relief for WFM's actions.

### COUNT II
**Unlawful Discrimination and Disparate Treatment In Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), et seq.**

83. Plaintiff re-alleges and reasserts the allegations in all of the preceding paragraphs as if fully set forth herein.

84. Plaintiff identifies as and is in fact a Muslim male individual from Morocco.

85. Plaintiff was an "employee" of WFM as that term is defined in 42 U.S.C. §2000e(f)

86. WFM is an "employer" as defined under 42 U.S.C. §2000e(b).

87. As an African-Muslim Male, Plaintiff was treated differently on the basis of race, religion, and national origin in comparison to similarly situated white, non-African, non-Muslim employees, as described herein.

88. Plaintiff was further treated differently than nearly every employee who was accused of inappropriate sexual conduct within the WFM store that Mr. Amimi worked at.

89. WFM and its agents, Ms. McMurtrie and Ms. Tenzcar harbored discriminatory animus against Plaintiff on the basis of his race, religion, and national origin as evidence by WFM's disparate treatment of Plaintiff in comparison to similarly

13

situated white, non-African, non-Muslim employees, and further evidenced by

Ms. McMurtrie's xenophobic comments made to Mr. Amimi, as described herein.

90. WFM's proffered reason for terminating Plaintiff was mere pretext for its

discriminatory motives.

91. But for Plaintiff being a north African-Muslim male from Morocco, he would not

have been the object of the adverse employment action (termination & sham

investigation), as described herein.

92. WFM is vicariously liable for the discriminatory actions/omissions of its

employees, officers, and agents.

93. Plaintiff has suffered actual pecuniary, emotional, and physical harm as a result of

the actions/omissions of WFM.

94. Plaintiff is entitled to all appropriate relief for WFM's actions.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff claims:

1. Monetary damages for front and back pay in an amount to be determined
   at trial;

2. Emotional distress damages in an amount to be determined at trial;

3. Statutory interest at the rate of twelve percent (12%);

4. Attorney's fees and costs; and

5. Such other legal or equitable relief as the Court may award.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
Mohamed Amimi
By counsel:

Emily E. Smith-Lee (BBO #634223)
esmithlee@slnlaw.com
Jacob J. Thaler (BBO #698852)
jthaler@slnlaw.com
slnlaw llc
46 South Main Street
Sharon, MA 02067
Tel: 781-784-2322
Fax: 781-328-1772

Dated:  January 20, 2020

15

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| PLAINTIFF(S): | Mohamed Amimi | | COUNTY | |
|---|---|---|---|---|
| ADDRESS: | 71 Montvale Avenue, Apt. 36 | | Middlesex | ☒ |
| Stoneham, MA 02180 | | DEFENDANT(S): | Whole Foods Markets | |

| ATTORNEY: | Jacob J. Thaler | | | |
|---|---|---|---|---|
| ADDRESS: | 48 South Main Street | ADDRESS: | 550 Bowie Street | |
| Sharon, MA 02067 | | Austin, TX 78703 | | |

| BBO: | 698852 |
|---|---|

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B22 | Discrimination | F | ☒ YES   ☐ NO |

*If "Other" please describe:

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ................................................................................................................ $ _____
    2. Total doctor expenses ................................................................................................................ $ _____
    3. Total chiropractic expenses ........................................................................................................ $ _____
    4. Total physical therapy expenses .................................................................................................. $ _____
    5. Total other expenses (describe below) ......................................................................................... $ _____
                                                     Subtotal (A): $ _____

B. Documented lost wages and compensation to date ............................................................................. $ 70,000
C. Documented property damages to dated ........................................................................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ............................................................ $ _____
E. Reasonably anticipated lost wages .................................................................................................. $ 60,000
F. Other documented items of damages (describe below) ........................................................................ $ TBD
Emotional Distress

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

                                                         At least
                                    TOTAL (A-F):$  130,000

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

                                          TOTAL: $  TBD

Signature of Attorney/Pro Se Plaintiff: X _____         Date: 01/20/2020

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____         Date: 01/20/2020

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                              SUPERIOR COURT DEPARTMENT
                                          CIVIL ACTION NO.:

| | |
|---|---|
| **MOHAMED AMIMI,**<br>    Plaintiff, | )<br>)<br>) |
| **v.** | )<br>) |
| **WHOLE FOODS MARKETS,**<br>    Defendant. | )<br>)<br>) |

## PLAINTIFF'S STATEMENT OF ESTIMATED MONEY DAMAGES

Pursuant to M.G.L. c. 212 § 3A, Plaintiff, Mohamed Amimi, through counsel, sets forth the following estimate of money damages and factual basis thereof.

| Category | Amount | Factual Basis |
|---|---|---|
| Lost Wages as a result of Wrongful Termination | $130,000 | Damages resulting from Defendants wrongful termination of Plaintiff. Defendants discriminated against Plaintiff on the basis of race and national origin. As a result of Defendants discrimination, Plaintiff has experienced and will experience over 1 year of lost wages to date and an additional year of lost future wages. |
| Emotional Distress | TBD | Emotional distress resulting from Defendants wrongful termination and discrimination of Plaintiff. Plaintiff has experienced severe physical and mental health damages as a result of the discriminatory conduct of the Defendants. |
| Attorney's fees | TBD | Attorney's fees for assessing claims, drafting the Complaint, participating in the discovery process, motion practice, trial preparation, and conducting trial. The actual amount of attorney's fees to be determined. |

Respectfully submitted,
Mohamed Amimi
By counsel:

Emily E. Smith-Lee (BBO# 634223)
esmithlee@slnlaw.com
Jacob J. Thaler (BBO# 698852)
jthaler@slnlaw.com
SLNLAW LLC
46 South Main Street
Sharon, MA 02067
Tel: 781-784-2322
Dated: January 20, 2020                    Fax: 781-328-1772