UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MOHAMMED AMIMI,

          Plaintiff,

v.                                      No. 20-cv-10375-DLC

WHOLE FOODS MARKETS,

          Defendant.

**MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

CABELL, U.S.M.J.

     Plaintiff Mohammed Amimi ("Amimi") brought suit against his former employer, defendant Whole Foods Markets ("Whole Foods"), for allegedly discriminating against him on the basis of his race, national origin, and religion, in violation of Massachusetts General Laws chapter 151B, sections 4(1) and 4(1B),[1] and Title VII of the Civil Rights Act of 1964.  Whole Foods moved for summary judgment, which the plaintiff opposed.  The court granted the motion in an electronic order, to be followed by a more fulsome

---

[1] The complaint references section 4(1B), which relates to age discrimination, but does not actually advance any allegations in that regard.  The court assumes the reference to be inadvertent surplusage and does not read the complaint as alleging age discrimination.

memorandum explaining its reasoning. (Dkt. No. 35). This memorandum provides that reasoning.

## I.   **FACTUAL BACKGROUND**

The following facts are undisputed except where otherwise noted. For the purposes of summary judgment, the court views the facts in the light most favorable to the plaintiff as the non-movant. *See Hicks v. Johnson*, 755 F.3d 738, 743 (1st Cir. 2014). Some additional relevant facts are raised and discussed later in connection with specific arguments.

### A.   **Amimi's Employment History**

Amimi was born in Morocco and considers himself a North African-American. (Dkt. No. 25, ¶ 6). He is a practicing Muslim. (*Id.*). Beginning in 2008, Amimi worked for Whole Foods at various locations in Massachusetts and North Carolina. (*Id.* at ¶¶ 7-8). Whole Foods permitted Amimi to set his own schedule, and Amimi scheduled his hours so that he could attend Mosque services on Friday afternoons. (*Id.* at ¶¶ 89-90).

In 2018, Amimi was promoted to produce team leader at Whole Foods' Symphony Store in Boston. (*Id.* at ¶ 10). In this position, he reported directly to store manager Julia McMurtrie ("McMurtrie"). (*Id.* at ¶ 11). As produce team leader, Amimi was responsible for the daily operations of the Produce Department, as well as training, scheduling, interviewing, and reviewing the performance of thirteen employees who reported to him. (*Id.* at ¶

13).  Amimi was also responsible for making employment decisions for the Produce Department subject to McMurtrie's approval.  (*Id.*).

Whole Foods maintains a handbook entitled the "General Information Guide," which includes a Policy Against Harassment ("the harassment policy") that prohibits unwanted touching, threats, and demands to submit to sexual requests to keep a job, as well as offers of job benefits in return for sexual favors. (*Id.* at ¶¶ 2-4).  Amimi acknowledged receipt of the harassment policy.  (*Id.* at ¶ 15).  After his promotion to produce team leader, Amimi received Whole Foods' "Respectful Workplace Training for Leadership," which included training on sexual harassment and fostering a climate of respect.  (*Id.* at ¶ 16).

### B.  **Alleged Discriminatory Conduct**

A few months after starting at the Symphony Store, Amimi noticed that the pay raise he received upon his promotion to team leader was less than the raise given to other team leaders in the store who were white and non-Muslim.  (Dkt. No. 28-2, p. 33, ¶ 9). Amimi mentioned the issue to McMurtrie, although Whole Foods contends that Amimi did not mention race or religion at the time. (*Id.;* Dkt. No. 31, ¶ 9).  The parties dispute whether McMurtrie ever sought an additional raise for Amimi.  (Dkt. No. 25-2, p. 33, ¶ 10; Dkt. No. 31, ¶ 10).  Amimi asserts that it was Whole Foods' practice to give individuals a raise of between 8% and 18% upon their promotion to Team Leader, whereas he only received a 4.25%

raise.  (Dkt. No. 25-2, p. 33, ¶¶ 11-12).  Whole Foods counters that the typical pay raise is 8% to 12%, that Amimi received an 11.3% pay increase upon his promotion, and that Amimi's pay was higher than at least some of the Symphony Store's other team leaders.  (Dkt. No. 31, ¶¶ 11-12).

Despite being one of the store's larger departments, the Produce Department did not have an assistant team leader ("ATL") during Amimi's tenure.  (Dkt. No. 28-2, p. 34, ¶ 13).  Amimi discussed his need for an ATL with McMurtrie on multiple occasions. (*Id.*).  According to Amimi, McMurtrie posted the position internally but took no other steps to hire someone. (*Id.* at p. 34, ¶ 14).  Only after Amimi's termination did McMurtrie hire an ATL to assist the new Produce Department team leader. (*Id.* at p. 34, ¶ 15).  Whole Foods disputes the characterization that McMurtrie did nothing else to find an ATL for Amimi, contending that she spoke with regional coordinators about transferring someone in from another store.  (Dkt. No. 31, ¶ 14).

Amimi and McMurtrie discussed Amimi's Muslim faith at least once.  (Dkt. No. 28-2, p. 34, ¶ 16).  Some time after that discussion, Amimi allegedly asked McMurtrie about having a celebration for another employee who recently became a United States citizen.  (Dkt. 28-2, p. 34, ¶ 17).  According to Amimi, McMurtrie responded by asking Amimi if he was a citizen. (*Id.* at p. 34, ¶ 18).  When Amimi confirmed that he was a citizen, McMurtrie

further responded, "Oh, lucky you.  You see what happened in 9/11?"
(*Id.* at p. 34, ¶ 19).  Whole Foods denies that this conversation
ever occurred and specifically denies that McMurtrie asked Amimi
about his citizenship or mentioned 9/11.  (Dkt. No. 31, ¶¶ 17-19).

Amimi further alleges that, on August 31, 2018, McMurtrie
informed all team leaders that they would need to be in the store
the following Friday because the Regional President was visiting.
(Dkt. No. 12, p. 5, ¶ 29; Dkt. No. 28-2, p. 34, ¶ 21).  Amimi
reminded McMurtrie that he scheduled himself to be off that day so
he could attend mosque services.  (Dkt. No. 25-3, p. 139:13-22).
McMurtrie nonetheless insisted that Amimi come in that day.  (Dkt.
No. 28-2, p. 34-35, ¶ 21).  Amimi ultimately missed mosque services
to work that day.  (Dkt. No. 25-3, p. 64).  For her part, McMurtrie
testified that she did not remember having any such conversation
with Amimi and that "she would not require anyone to miss religious
services to attend work."  (Dkt. No. 31, ¶ 21).

## C.  Amimi's Relationship with Team Member C.A.

Beginning in August 2018, Amimi, who was then 37 years old
and married, had a consensual romantic relationship with C.A., a
college student in her early twenties who worked part time as a
"team member" at the coffee bar at the Symphony Whole Foods store.
(Dkt. No. 25, ¶¶ 18-21).  Amimi did not supervise C.A., as the
coffee bar was part of the Specialty Department, not the Produce
Department.  (*Id.* at ¶ 19).  A consensual relationship between a

team leader in one department and a team member in another department does not violate Whole Foods' policies. (*Id.* at ¶ 64). The relationship began after C.A. and Amimi discussed the possibility of C.A. working in the Floral Department, which was part of the Produce Department. (*Id.* at ¶ 32). The parties dispute whether Amimi made any promises to C.A. about the transfer. (Dkt. No. 31, ¶¶ 44-45).

Between August 8 and September 27, 2018, Amimi and C.A. exchanged approximately 340 text messages. (Dkt. No. 25, ¶ 22). Each sent some sexually explicit texts. (*Id.*). In some of the messages, Amimi referred to C.A. as "babe" and told her she was "looking hot." (*Id.*). In others the two arranged to meet during work or lunch breaks for sexual encounters in Amimi's car in the parking lot adjacent to the Symphony store. (*Id.* at ¶ 23).

On August 27, 2018, upon his return from vacation, Amimi texted C.A. to ask whether they were meeting that day. (*Id.* at ¶ 24). C.A. responded "No, I'm going home," and explained, "I don't want to have sex." (*Id.* at ¶ 25). That same day, C.A. texted Amimi saying "I'm not that attracted to you. I like you, but I don't want to f--- you." (*Id.* at ¶ 27). On September 9, 2018, C.A. reiterated through two text messages that she no longer wanted to have sex with Amimi. (*Id.*)

Despite C.A.'s messages, Amimi continued to pursue C.A. and flirt with her. (*Id.* at ¶ 38). On September 23, Amimi and C.A.

arranged to meet in the nearby parking garage during a break. (*Id.* at ¶¶ 39-40). Allegedly, Amimi convinced C.A. to join him in his car, where he forced her to perform oral sex on him. (*Id.* at ¶¶ 40-41). Amimi denies having sex with C.A. on that occasion, alleging instead that C.A. jumped on him and kissed him. (*Id.* at ¶ 59). He further alleges that he never suggested sexual activity to C.A. after August 27. (Dkt. No. 28-2, p. 11, ¶ 38).

### D. **C.A.'s Complaint to Whole Foods and the Investigation**

On October 21, 2018, C.A. informed McMurtrie that she had been having a relationship with Amimi, and that she asked for it to stop and for him to stop bothering her, but that he was still pursuing her. (Dkt. No. 25, ¶ 28). C.A. told McMurtrie that she was feeling extremely uncomfortable and unsafe coming to work. (*Id.* at ¶ 29). McMurtrie referred the matter to Team Member Services ("TMS"), Whole Foods' human resources department, which is responsible for investigating serious potential infractions, particularly involving a team leader. (*Id.* at ¶¶ 5, 30).

#### 1. C.A.'s Interview

On October 22, 2018, Danielle Tenczar, Regional Team Member Services Coordinator ("Tenczar"), and Linda Shear, Team Member Services Executive Coordinator ("Shear") (collectively, "TMS coordinators"), interviewed C.A. at an off-site location as part of the internal investigation of her complaint against Amimi. (*Id.* at ¶ 31). C.A. described the course of her relationship with Amimi

to the TMS coordinators and provided them copies of her text messages with him. (*Id.* at ¶¶ 32-37). She also told the TMS coordinators about how Amimi continued to pursue her after she ended their relationship and about their encounter on September 23. (Id. at ¶¶ 38-41). C.A. stated that she did not want to have sex with Amimi that day but felt pressured and intimidated to do so because of Amimi's age, his leadership position, and his "culture" and how she understood Moroccan men treat women. (*Id.* at ¶¶ 42; Dkt. No. 28-2, p. 38, ¶ 52 and p. 40, ¶ 68).

    2.  <u>Amimi's Interview</u>

On October 25, 2018, Tenczar and Shear interviewed Amimi in the Symphony store with McMurtrie present. (Dkt. No. 25, ¶ 47). Prior to his interview, Amimi signed an Investigation Notice affirming he understood that, under Whole Foods' policy, if he were found to be not truthful or not forthcoming, it would be grounds for dismissal. (*Id.* at ¶¶ 48-49). After some apparent initial confusion, Amimi admitted that he and C.A. were previously in a relationship. (*Id.* at ¶¶ 53-55). The defendant alleges that Amimi initially denied having "sex" with C.A. in his car, claiming he did not understand the terms "blow job" or "oral sex" used in the interview. (*Id.* at ¶ 56). He later admitted to receiving oral sex from C.A. several times in his car but asserted this was always consensual. (*Id.* at ¶ 57). Amimi contends that he was initially confused by the questioning but spoke honestly about his

relationship with C.A.   (Dkt. No. 28-2, pp. 15-16, ¶¶ 53-56).
Amimi denied that he forced C.A. to perform oral sex on September
23, 2018.  (Dkt. No. 25, ¶ 58).

### 3.  Amimi's Time Sheets

As part of the TMS investigation, McMurtrie reviewed Amimi's
and C.A.'s timesheets and provided them to the TMS coordinators.
(*Id.* at ¶ 43).   McMurtrie also reviewed the parking garage's
security video recordings for September 23, 2018. (*Id.*).  According
to the defendant, Amimi's time sheets, combined with his text
messages with C.A., revealed that there were several dates on which
Amimi did not punch out for his required half hour lunch break
when he met with C.A., and then later punched in and out for his
half hour lunch while he was working.  (*Id.* at ¶ 45).   Amimi
contends that this only happened twice: once when he forgot to
punch out for lunch and then worked off the clock to make up the
time, and once when he was only taking his 15-minute break and
thus was not required to punch out.  (Dkt. No. 28-2, p. 13, ¶ 45).

### E.  Whole Foods' Decision to Terminate Amimi

Tenczar placed Amimi on paid administrative leave immediately
after his interview, pending the conclusion of the TMS
investigation.  (*Id.* at ¶¶ 55-56).  On that same day, Tenczar and
Shear discussed the investigation and their findings.  (Dkt. No.
25, ¶ 63).  The TMS coordinators concluded that Amimi pursued a
relationship with C.A. based on discussions about her working in

his department and that he continued pursuing a relationship even after C.A. clearly told him that she was no longer interested. (*Id.* at ¶ 66).  They also concluded that Amimi had falsified his time sheets and that he was not forthcoming during his interview. (*Id.* at ¶¶ 68-69).  They were, however, unable to conclude whether Amimi and C.A. engaged in nonconsensual sex on September 23, 2018. (*Id.* at ¶ 65).  Amimi does not dispute that the TMS coordinators made these findings, but he does dispute their accuracy (apart from the finding regarding September 23).  (Dkt. No. 28-2, pp. 19-21, ¶¶ 65-69).

During or after their discussion, the TMS coordinators recommended to Bill McGowan ("McGowan"), Executive Coordinator of Operations and a member of Whole Foods' regional executive leadership, that Amimi's employment be terminated based on their findings.  (Dkt. No. 25, ¶¶ 63, 67-69).  McGowan agreed.  (*Id.* at ¶ 70).  The following day, McMurtrie notified Amimi of his termination, effective immediately, based on an explanation prepared by the TMS coordinators.  (*Id.* at ¶¶ 70-71).  Amimi contends that, given the short time between his interview and the termination decision, the decision had already been made before the TMS coordinators consulted McGowan.  (Dkt. No. 28-2, pp. 18-19, ¶ 63).

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). "An issue is 'genuine' if it can be 'resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'" *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)).

Once the moving party meets its initial burden, the opposing party "bears the burden of producing specific facts sufficient to defeat summary judgment." *González-Cabán v. JR Seafood Inc.*, 48 F.4th 10, 14 (1st Cir. 2022) (internal quotations omitted). More narrowly, the opposing party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation omitted); *see also Ingram v. Brink's, Inc.*, 414 F.3d 222, 229 (1st Cir. 2005) ("[S]ummary judgment cannot be defeated by relying on improbable inferences,

conclusory allegations, or rank speculation.").  Ultimately, the court must "view the record in the light most favorable to the non-moving party and resolve all reasonable inferences in its favor, without weighing the evidence or evaluating the credibility of the witnesses."  *Sheehan v. The N. Am. Mktg. Corp.*, 610 F.3d 144, 149 (1st Cir. 2010) (citing *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006)).

## III.  **DISCUSSION**

### A.  **Legal Framework**

Under both federal and Massachusetts law, discrimination claims are analyzed under the familiar *McDonnell Douglas* three-step burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 680-81 (2016).  Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.  If he does so, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the challenged decision.  *Id.*  If the employer meets this burden, the burden returns to the plaintiff to show that the employer's proffered reasons were mere pretext for discrimination.  *Id.* at 804.  At this final step, the original presumption of discrimination drops out of the case and the trier of fact must decide the ultimate question of whether the plaintiff has proven unlawful discrimination.  *St. Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 510–11 (1993); *see Mesnick v. General Elec. Co.*, 950 F.2d 816, (At summary judgment, "the ultimate question becomes whether, on all the evidence of record, a rational factfinder could conclude that [a protected category] was a determining factor in the employer's decision.").

Applying the framework here, Whole Foods concedes for summary judgment purposes that Amimi has established a *prima facie* case of discrimination based on race, national origin, and religion. (Dkt. No. 24, p. 13). The court agrees that Amimi has satisfied this hurdle. Amimi in turn concedes that Whole Foods has proffered legitimate reasons for his termination. (Dkt. No. 28, p. 13). Again, the court agrees. *See, e.g., Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 24 (1st Cir. 2015) (plaintiff's misconduct was legitimate, nondiscriminatory reason for termination); *Ortiz-Rivera v. Astra Zeneca LP,* 363 F. App'x 45, 47 (1st Cir. 2010) (serious doubts about plaintiff's honesty constitute a legitimate, nondiscriminatory basis for adverse employment action).

The burden thus shifts back to the Amimi to "produce sufficient evidence to create a genuine issue of material fact as to two points: 1) [Whole Foods'] articulated reasons for its adverse actions were pretextual, and 2) the real reason for [its] actions was discriminatory animus." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 (1st Cir. 2015) (internal quotation omitted); *but see*

*Bulwer*, 473 Mass. at 682 (to survive summary judgment on chapter 151B claim, plaintiff only needs to present evidence of pretext). Pretext can be shown in numerous ways. Some involve the circumstances of the adverse employment action itself, including changing explanations for the action, *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 431-32 (1st Cir. 2000), deviations from standard policies and procedures, *Theidon v. Harvard Univ.*, 948 F.3d 477, 499 (1st Cir. 2020), and "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons," *Santiago-Ramos v. Centennial P.R. Wireless Corp*, 217 F.3d 46, 56 (1st Cir. 2000). Other means of showing pretext involve the employer's conduct beyond the adverse employment action, such as disparate treatment of similarly situated employees or racially derogatory remarks. *Ray,* 799 F.3d at 114, 116.

"When assessing a claim of pretext in an employment discrimination case, an inquiring court must focus on the motivations and perceptions of the actual decisionmaker." *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007) (citing *Dávila v. Corporación de P.R. para la Difusión Pública*, 498 F.3d 9, 16 (1st Cir. 2007)). To establish pretext, it is not enough for the plaintiff to show that the decisionmaker reached a faulty conclusion. *Bennett*, 507 F.3d at 31 (citing *Dávila*, 498 F.3d at 17 and *Mesnick*, 950 F.2d at 825); *see also Theidon*, 948 F.3d at

499 ("anti-discrimination laws do not insure against inaccuracy or flawed business judgment on the employer's part") (internal quotation omitted).   "Rather, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given" for the adverse employment action. *Bennett*, 507 F.3d at 31 (citing *Ronda Pérez v. Banco Bilbao Vizcaya Argentaria*, 404 F.3d 42, 45 (1st Cir. 2005) and *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 256 (1st Cir. 1986)).

## B.  Evidence of Pretext in the Investigation Process

Amimi attacks each of Whole Foods' stated reasons for his termination as pretextual.  To substantiate his argument, he points to alleged deficiencies in the termination process as well as disparate treatment compared to other similarly situated employees and instances of discrimination prior to his termination.  The court begins with Amimi's direct objections to Whole Foods' proffered reasons.

### 1.  Amimi's Pursuit of a Relationship with C.A.

One reason Whole Foods gave for terminating Amimi was his inappropriate pursuit of a sexual relationship with C.A.  Amimi attacks this reason on two grounds.  First, Amimi disputes that the relationship began after he promised C.A. that he could get her a job in the Produce Department, or indeed that he ever made such a promise.  (Dkt. No. 28, p. 14).  Second, Amimi points out that the TMS coordinators never reached a conclusion as to whether

Amimi and C.A. engaged in any sexual activity on September 23. (*Id.* at p. 15).  These objections misinterpret the record and anyway fail to advance Amimi's case under the applicable law.

Whole Foods does not claim that it terminated Amimi because he made promises or representations to C.A. or because he allegedly forced C.A. to have sex with him on September 23.  Whole Foods terminated Amimi for, *inter alia*, violating the harassment policy by pursuing a relationship with C.A. after she told him she was no longer interested.  (Dkt. No. 24, pp. 12-13; Dkt. No. 25-3, p. 174).  Notably, Amimi does not contest that he continued to pursue C.A., focusing only on the alleged sexual encounter on September 23.  Of course, even if Amimi could prove that he did not so pursue C.A., that would not be enough.  Amimi would have to prove that the TMS coordinators did not believe that he violated the harassment policy.  *See Bennett*, 507 F.3d at 31.  His objections pose no challenge to the sincerity of the TMS coordinators' belief. As such, they do not establish a genuine issue of material fact as to pretext.

### 2.  Amimi's Falsified Time Sheets

Amimi similarly challenges Whole Foods' contention that it terminated him for falsifying his time sheets.  The TMS coordinators found that "two of the intimate meetings [between Amimi and C.A.] took place while [Amimi] was clocked in to work." (Dkt. No. 25-3, p. 174).  Amimi argues that he was only required

to punch out on one of these occasions, and that, regardless, full-time employees forget to punch out for breaks "a few times a month" on average.  (Dkt. No. 28, p. 14).  These arguments, even if true, do not establish that the TMS coordinators used this reason as a pretext for Amimi's termination.  Again, it is not enough for Amimi to show that the TMS coordinators reached an erroneous conclusion; he must show that they did not believe in their stated conclusion, *see Bennett*, 507 F.3d at 31, a proposition for which he has offered no evidence.

Whole Foods' policies list "[f]alsifying reports or records, including . . . financial and payroll reports/timecards" under "Major Infractions" as an "[e]xample[] of conduct that may lead to discharge."  (Dkt. No. 25-3, p. 166).  In his deposition, Amimi acknowledged his awareness that he could be terminated if he did not accurately report his time at work.  (*Id.* at p. 47).  The TMS coordinators found that Amimi did just that, and moreover that he did it in connection with a relationship with a team member that later devolved into sexual harassment.  Whole Foods' policies are clear that falsifying time sheets is a terminable offense.  The evidence, even when viewed in the light most favorable to Amimi, suggests that the TMS coordinators sincerely believed that Amimi violated this policy, for which termination was a known sanction.

### 3.  Violation of the Investigation Policy

Amimi also contests Whole Foods' explanation that it terminated him for being dishonest in his interview, in violation of its investigation policy.  He argues that Whole Foods has not identified any facts Amimi withheld during the interview.  Further, he argues that, insofar as the TMS coordinators found him to be "evasive" and "not forthcoming," their findings were based on Amimi's difficulties speaking English and their decision to credit C.A.'s account over his own.  Assuming that Amimi is correct, these arguments at best establish that the TMS coordinators made an incorrect finding.  By contrast, Amimi offers no evidence that the TMS coordinators did not truly believe that he was evasive or uncooperative in the interview, however correct or erroneous their belief may have been.  Without any such evidence, no reasonable factfinder could find that this reason for Amimi's termination was pretextual.  *See Bennett*, 507 F.3d at 31.

### 4.  Deficiencies in the Review Process

Apart from directly attacking Whole Foods' proffered reasons, Amimi identifies several alleged deficiencies in Whole Foods' review of his termination, namely that (1) Tenczar conducted the first-level review herself despite being involved in the initial investigation; (2) Tenczar's report to the second-level peer review committee contained inaccuracies about when C.A. initially reported that Amimi forced her to perform oral sex and whether

Amimi admitted to having oral sex with C.A. on September 23; and (3) the peer review committee's failure to investigate or discuss concerns Amimi raised about his difficulties expressing himself in English and about the investigation potentially violated Whole Foods' diversity policy. (Dkt. No. 28, pp. 19-20). He argues that Whole Foods' "failure to follow established procedures or criteria . . . [may] support a reasonable inference of intentional discrimination." (*Id.* at p. 19) (quoting *Bulwer*, 437 Mass. at 687).

Amimi is correct that an employer's deviation from its own policies or procedures may give rise to an inference of pretext. *Theidon*, 948 F.3d at 499. However, evidence of a deviation standing alone is insufficient, as is evidence that an employee was treated unfairly. "Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." *Mesnick*, 950 F.2d at 825. A plaintiff must offer some evidence tying the deviations to the alleged discrimination. *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 22 (1st Cir. 1999). Amimi fails to make any such showing apart from one contention regarding Tenczar's notes, to which the court now turns.[2]

---

[2] Amimi also takes issue with Tenczar declining, after his termination, to interview a witness he identified. (Dkt. No. 28, p. 16). The record reflects that this witness, a Whole Foods employee, allegedly learned from another Whole Foods employee that C.A. fabricated the allegations against

###### 5.  **Tenczar's Notes**

Amimi also points to certain notes Tenczar took during C.A.'s interview and notes she later shared with the peer review committee as evidence that racial and ethnic bias permeated his termination. In her interview notes, Tenczar wrote the following: "She's Algerian – he's Moroccan.  Saw cousin's fiancé beat her up in an airport, Cultural thing – afraid he would do that." (Dkt. No. 28-2, p. 38, ¶ 51).  These notes reflected what C.A. told the TMS coordinators during her interview.  (*Id.*).  Subsequently, in her statement to the peer review committee, Tenczar wrote: "[C.A.] stated that given how she knew Moroccan men treated women and their dominance combined with his age and position she performed the sexual act because she was afraid and felt she could do it quickly to get away from [Amimi]." (Dkt. No. 29-2, p. 50).  Amimi argues that "[a] reasonable jury could interpret these comments as reflecting '[s]tereotypical thinking . . . categorizing people on the basis of broad generalizations" and that such thinking "clearly played a role in the TMS team's assessment." (Dkt. No. 28, p. 12) (quoting *Bulwer*, 473 Mass. at 686).  This argument does not align with the evidence.

---

Amimi.  (Dkt. No. 29-2, pp. 20-21).  The court does not agree that Tenczar's decision not to investigate this double or even triple hearsay lead was unreasonable, and in any case Amimi fails to illustrate how this decision evinces any pretext.  *See Rodriguez-Cuervos*, 181 F.3d at 22; *see also Dusel v. Factory Mut. Ins. Co.*, 52 F.4th 495, 502 (1st Cir. 2022) (in ruling on summary judgment, court draws "all *reasonable* inferences" in nonmovant's favor) (emphasis added).

Tenczar explained in her deposition that she presented this information to the peer review committee because it helped explain why the TMS coordinators found C.A. credible. (Dkt. No. 25-4, p. 25). Essentially, C.A.'s stated apprehension about Amimi and what he might do if she refused him, colored as it was by her own perceptions and personal experiences, explained why she reportedly engaged in sexual activity with him on September 23 rather than running away. (*Id.* at p. 54). In other words, Tenczar credited C.A.'s *subjective* views without adopting them as *objective* truths. All that mattered was whether and why C.A. found Amimi intimidating, not whether her reasons for thinking so were correct.

Worse yet for Amimi, the record is clear that the TMS coordinators ultimately did not base their decision on C.A.'s credibility. The TMS coordinators did not find that Amimi and C.A. engaged in sexual activity on September 23 despite C.A.'s clear account, suggesting that they did not totally credit her. Tenczar testified that her conclusion that the relationship became nonconsensual, and thus that Amimi violated the harassment policy, was primarily based on the text messages between Amimi and C.A., which speak for themselves. (*Id.* at pp. 53-54). Presented with this evidence, no reasonable jury could find that Tenczar's notes of C.A.'s account demonstrate that Whole Foods' stated reasons for Amimi's termination were pretextual.

### C.  **Evidence of Pretext Collateral to the Investigation**

Having considered Amimi's direct challenges to Whole Foods' decision to terminate him, the court now turns to his other attempts to establish pretext.  These fare little better, as discussed below.

### 1.  **Comparators**

In an effort to show that his termination was discriminatorily motivated, Amimi points to three other Symphony Store employees who violated Whole Foods' sexual harassment policy, including two team members who were not terminated and one assistant store leader who was.  (Dkt. No. 28, pp. 5-6, 17-18; Dkt. No. 28-2, pp. 35-36, ¶¶ 23-39).  Amimi describes both team members as "non-African," specifying that one was caucasian and another was Muslim.  (Dkt. No. 28, pp. 5, 15).  The terminated assistant store leader, like Amimi, was a "first generation immigrant[] from North Africa and dark-skinned."  (*Id.* at p. 4).  Amimi contends that a reasonable jury could conclude from the treatment of the two non-African team members on the one hand, who were not fired, and himself and the North African assistant store leader on the other, who were, that Amimi's termination was racially or ethnically motivated.[3]

Where, as here, a plaintiff seeks to use comparators as evidence of discrimination, he must show that the comparators are

---

[3] The court notes that, as one of the non-terminated team members is Muslim, the comparison tends to blunt rather than support Amimi's claim of religious discrimination.

"similarly situated to him in all relevant respects." *Conward v.
Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999).
"Reasonableness is the touchstone: while the plaintiff's case and
the comparison cases that he advances need not be perfect replicas,
they must closely resemble one another in respect to relevant facts
and circumstances." *Id.* Among these "facts and circumstances" is
whether the plaintiff and the comparator were disciplined for the
same conduct. *See Murray v. Kindred Nursing Ctrs. West LLC*, 789
F.3d 20, 27 (1st Cir. 2015) (distinguishing between drug diversion
and drug use); *Conward*, 171 F.3d at 21 (distinguishing between
"[t]he improper use of physical force . . . and sexual
harassment"). Also important is whether the plaintiff and the
comparators share the same position or responsibilities. *See
González-Bermúdez v. Abbott Laboratories P.R. Inc.*, 990 F.3d 37,
44 (1st Cir. 2021) (finding comparators who "occupied lower
positions, performed different duties, and reported to different
supervisors than" the plaintiff were not similarly situated);
*Daumont-Colón v. Cooperative de Ahorro y Crédito de Caguas*, 982
F.3d 20, 29 (1st Cir. 2020) (upholding district court's exclusion
of comparator evidence at trial where comparator did not hold a
"senior position" like plaintiff's); *Woodward v. Emulex Corp.*, 714
F.3d 632, 639 (1st Cir. 2013) (applying Massachusetts law and
finding that two employees who held "positions senior" to plaintiff
were not similarly situated to him); *Garcia v. Bristol-Myers Squibb*

*Co.*, 535 F.3d 23, 32 (1st Cir. 2008) (noting plaintiff "was the only person with the title of Senior Project Engineer and she had different job responsibilities from the others in her department"); *Danna v. R.I. Sch. of Design*, Civil Action No. 21-188-JJM-PAS, 2022 WL 1538881, at *4 (D.R.I. May 16, 2022) (finding "no plausible allegations" that supervisor and subordinate were comparators).

The glaring distinction between Amimi and the assistant store leader on one hand and the two team members on the other is that the two team members were lower-level employees without managerial duties.  *See* (Dkt. No. 25, ¶ 102; Dkt. No. 28-2, p. 30, ¶ 102). This difference alone is enough to establish that the comparators are not similarly situated.  *See, e.g.*, *Daumont-Colón*, 982 F.3d at 29; *Woodward*, 714 F.3d at 639.

Amimi attempts to circumvent this problem by pointing to the harassment policy, which states that "[h]arassment on the job is unlawful whether it involves harassment by a Team Member, by a Team Leader, or by persons doing business with or for the company." (Dkt. No. 28, p. 18).  While the policy clearly prohibits all Whole Foods employees from engaging in sexual harassment, noting that in any case such harassment is unlawful, the policy does not require disciplining all employees for policy violations in the same manner.  *Cf. Daumont-Colón*, 982 F.3d at 29-30 (rejecting argument that "Credit Union's stated policy of applying its disciplinary

rules uniformly to all employees . . . somehow compelled the court to disregard employees' roles and responsibilities in determining if those employees were similarly situated"). Contrary to Amimi's argument, the policy does not smooth out the distinctions between team leaders and team members.

While the court need not go any further, it bears noting that Amimi and the non-terminated comparators were not disciplined for the same conduct. Amimi was terminated for violating the sexual harassment policy, for falsifying his time sheets, and for being evasive in his interview, and the assistant store leader similarly was terminated for "'poor judgment,' violation of the sexual harassment policy, and not being forthcoming in an investigation." (Dkt. No. 28-2, p. 36, ¶ 38). By contrast, although the two team members also violated the sexual harassment policy (ignoring for a moment the differences in the underlying conduct), there is no evidence to suggest that either falsified any time sheets or was not forthcoming in an investigation. It stands to reason that an employer may discipline an employee who violates multiple policies more severely than an employee who only violates one. In this regard, as in their respective positions, the team members are not similarly situated to Amimi. *See Murray*, 789 F.3d at 27. Because they are not similarly situated, any comparison they might offer to Amimi is unavailing.

### 2.   Allegations Regarding McMurtrie

The remaining evidence that Amimi proffers to show pretext relates to decisions or remarks made by McMurtrie, namely (1) McMurtrie's alleged remarks about Amimi's citizenship; (2) McMurtrie requiring Amimi to work one Friday afternoon; (3) McMurtrie's failure to provide Amimi with an ATL; and (4) Amimi's relatively low raise upon his promotion to team leader.

This evidence encounters a significant problem at the threshold.  To succeed on a discrimination claim, the plaintiff must be able to trace the discriminatory intent of which he complains "to the person or persons who made the decision to fire him." *Bennett*, 507 F.3d at 31; *see also Melendez v. Autogermana, Inc.*, 622 F.3d 46, 54 (1st Cir. 2010) ("[S]tatements made either by non-decisionmakers or by decisionmakers not involved in the decisional process[] normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.") (internal quotation omitted); *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 178 (1st Cir. 2008) (applying *Bennett* rule to Massachusetts state law discrimination claim).  Three people made the decision to terminate Amimi:  Shear, Tenczar, and McGowan.  Shear and Tenczar conducted the investigation and jointly recommended that Amimi be terminated, and McGowan accepted that recommendation and authorized the termination.  (Dkt. No. 25, ¶¶ 63, 67-69, 70).  McMurtrie's role in the process was limited to reporting C.A.'s

allegations to TMS and later relaying the termination decision to Amimi.  (*Id.* at ¶¶ 30, 71-72).

Undeterred, Amimi makes three attempts to paint McMurtrie as a decisionmaker.  First, he argues that McMurtrie "remained involved in collecting the facts to support the narrative that was used to justify his termination." (Dkt. No. 28, p. 11; Dkt. No. 28-2, p. 8, ¶ 30).  However, the evidence he cites in support at most establishes that McMurtrie sometimes gathered information after receiving a harassment complaint and sometimes reported the complaint to Team Member Services immediately, (Dkt. No. 29-1, p. 6), that she was present for some of the witness interviews, (Dkt. No. 29-3, pp. 18-19), and that she had the opportunity to ask questions during Amimi's interview although, "for the most part, [the TMS coordinators] would be asking questions." (Dkt. No. 29-2, p. 13).[4]  None of this suggests that McMurtrie was involved in building a narrative against Amimi.  Regardless, assisting in collecting facts is not the same as making a termination decision.

Second, Amimi contrasts another instance of sexual harassment, where McMurtrie "was able to and did intercede in that decision-making process to obtain a lesser sanction for that employee than dismissal," with Amimi's case, where McMurtrie did not so intervene.  (Dkt. No. 28, p. 11).  This comparison fails on

---

[4] Additional evidence reflects that McMurtrie reviewed Amimi's and C.A.'s timesheets, which she provided to TMS, and also reviewed surveillance video from the parking garage.  (Dkt. No. 25, ¶ 43).

a few levels. First, the record reveals that McMurtrie chiefly investigated the other sexual harassment complaint on her own while seeking guidance from Tenczar's subordinate, (Dkt. No. 29-5, pp. 15-24), whereas here TMS led the investigation from the outset. Second, Amimi offers no evidence suggesting that the TMS coordinators would have deferred to McMurtrie if she had interceded on his behalf. Finally, and relatedly, interceding on an employee's behalf is not the same thing as deciding an employee's fate. In fact, intercession suggests appealing to an actual decisionmaker, in this case the TMS coordinators. Even if McMurtrie could have pushed for Amimi to receive a lesser sanction and chose not to, that does not mean she made the decision to terminate Amimi.

Finally, Amimi cites *Henry v. Sterling Collision Ctrs. Inc.*, 252 F. Supp. 3d 42, 49-50 (D. Mass. 2017), for the proposition that McMurtrie was a decisionmaker because she "actually implemented [Amimi's] termination." (Dkt. No. 28, p. 11). Amimi's reliance on *Henry* is misplaced. In *Henry*, the plaintiff's supervisor "signed off" on the plaintiff's termination and participated in her termination meeting, where he was among those who explained the reasons for the decision. 252 F. Supp. 3d at 47, 49. McMurtrie did not "sign off" on the decision to terminate Amimi. Her role in "implementing" the termination was limited to calling Amimi and informing him of the reasons for his termination

as she received them from the TMS coordinators.  (Dkt. No. 25, ¶¶ 71-72; Dkt. No. 25-6, pp. 19-21).  McMurtrie did not make the decision; she was merely its conduit.  Moreover, Amimi himself testified that he did not have any reason to believe that the actual decisionmakers would discriminate against him.  (Dkt. No. 25, ¶ 99; Dkt. No. 28-2, p. 30, ¶ 99).  Accordingly, even accepting Amimi's assertions about McMurtrie's conduct as true and taking all reasonable inferences therefrom in his favor, these assertions fail to demonstrate pretext on the part of any decisionmaker.  *See Bennett*, 507 F.3d at 31.[5]

IV.  **CONCLUSION**

For the foregoing reasons, the defendant is entitled to judgment on all claims as a matter of law.

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  January 13, 2023

---

[5] In addition, the court notes that the evidence of McMurtrie's alleged discrimination against Amimi is "temporally remote from . . . [and] not related to" the decision to terminate his employment, thus further diminishing its probativeness.  *See Straughn v. Delta Air Lines*, 250 F.3d 23, 36 (1st Cir. 2001).